J-A29007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.D.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.D. | : | |
| | : | |
| Appellant | : | No. 462 WDA 2019 |

Appeal from the Order Entered March 12, 2019
In the Court of Common Pleas of Butler County Civil Division at No(s):
F.C. No. 12-90161-C

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JANUARY 10, 2020**

M.D. (Mother) appeals from the custody order dated March 12, 2019, that set out the custody arrangements for A.O.D. (Child), born in September of 2010, between Mother and J.D.D. (Father), after its reconsideration of its prior November 9, 2018 order as requested by Father.  The March 12, 2019 order provided that Father was to continue primary custody of Child, with Mother being awarded partial custody of Child every other weekend and one or two evenings during the week with no overnights.  Mother's custody time was to be held in a public location and without any contact with her four adult children.  After an extensive review, we affirm.

The relevant scope and standard of review in custody matters are as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. … However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. … Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

Mother raises the following five issues for our review:

1. Did the trial court commit an abuse of discretion and/or error of law when, after entering an initial order granting Mother partial physical custody, the trial court then entered a reconsidered order that reduced Mother's partial physical custody, when no new evidence and no new testimony was provided?

2. Did the trial court commit an abuse of discretion and/or an error of law by offering no new findings of fact and opinions, or any kind of explanation, for reversing its initial decision and issuing the reconsidered one?

3. Did the trial court commit an abuse of discretion and/or an error of law when it simply signed Father's proposed reconsideration order without making any changes, even including the same clerical errors and Father's certificate of service, and not attaching the general custody policies?

4. Was it contrary to the best interest of … [C]hild for the trial court to reverse itself and reduce and limit Mother's partial physical custody, after the trial court had allowed … [C]hild to have additional partial physical custody with Mother for four months, and where there was no new evidence suggesting any harm had come to … [C]hild from the additional partial physical custody time with Mother?

5. Did the trial court commit an abuse of discretion and/or error of law by reducing and limiting Mother's partial physical custody where the following [23 Pa.C.S.] § 5328(a) factors were neutral or in Mother's favor:  (1), (3), (4), (5), (7), (8), (9), (10), (11), (12), (13), (14), and (15)?

Mother's brief at 4.

In its opinion, the trial court set forth a factual and procedural history of this case and included information relating to the testimony of various witnesses.  In addition, the trial court discussed and applied the custody factors contained in 23 Pa.C.S. § 5328.  The court also explained its reasons for issuing the March 12, 2019 order now on appeal.  Most notably, the court

mentioned the high conflict and contentiousness of this custody case that does not appear to have lessened over the years.[1]

We have reviewed the certified record, the parties' briefs, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Kelley T.D. Streib of the Court of Common Pleas of Butler County, dated May 24, 2019. We conclude that Judge Streib's opinion properly disposes of the issues presented by Mother in this appeal. Accordingly, we adopt the trial court's opinion as our own and affirm the custody order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2020

---

[1] We point out that the present appeal is the second one that Mother filed with this Court that has considered the custody of Child. **See J.D.D. v. M.D.**, 151 A.3d 1131 (Pa. Super. 2016) (unpublished memorandum).

## IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA



J.D.D.

    )
    )
**Plaintiff**    )
    )
    )       **F.C. No. 12-90161-C**
**v.**    )
    M.D.    )
    ,    )
    )
**Defendant**    )
    )

### 1925(a) MEMORANDUM OPINION

M.D.                    J.D.D.

("Mother") and ("Father") are the parents to A.O.D. ("Child"). Mother and Father married on June 10, 2010, and Child was born on September 19, 2010. The parties separated on August 30, 2013, and divorced on November 20, 2017. Child is the only child of issue to the marriage. Mother also has four other children, Edward (age 20), Henry (age 19), H.G. (age 17), and A.G. (age 17), from her previous relationship with K.G.[1]

Since the separation the parties have engaged in *lengthy high conflict* custody litigation. The present appeal involves an appeal from a custody Order issued by the Trial Court following a Motion for Reconsideration filed by Father. For the clarity of the issues presented, the factual and procedural history of this matter will presented in this Court's discussion of Mother's fifth (and final) matter raised on appeal.

---

[1] H.G. and A.G. are now 18 years old.

1

While this case is highly complex case, procedurally and factually, what is not complex is the basic issue at hand. This Court committed an error when it issued its first Order granting Mother partial physical custody as this Order was not supported by the Court's Findings of Fact, nor its 16 Factor Analysis, that were filed with the Order. Father filed a Motion for Reconsideration requesting this court correct that error. Upon review of the record, specifically this Court's Findings of Fact and 16 Factor Analysis, this Court recognized that it had in fact erred. Consequently, this Court issued a new Order, which addressed the error and was consistent with its previously issued Findings and Analysis

From the outset, it must be noted that Mother has *not* asserted in her Concise Statement of Matter Complained of on Appeal that the record does not support this Court's Order, nor has she asserted that the previous Order was supported by the Findings or the 16 Factor Analysis. Mother attempts to side-step this fact by relying on a basic position that the courts should put form over substance.

The Superior Court's scope and standard of review in custody cases is:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

R.L.P. v.R.F.M. , 110 A.3d 201, 207-208 (Pa.Super. 2015), (citing C.R.F., III v. S.E.F., 45 A.3d 441, 443 (Pa.Super.2012) (citation omitted)).

2

D CC

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

Id., at 208 (citing Ketterer v. Seifert, 902 A.2d 533, 540 (Pa.Super.2006) (citations omitted)).

The Trial Court will address Mother's first two Concise Statements together as they raise the similar issues. Mother asserts:

1. Did the trial court commit and abuse of discretion and/or error of law when, after entering the initial order granting Mother additional physical custody, the trial court then entered a reconsidered order that reduced Mother's partial physical custody, when no new evidence and no new testimony was provided?

2. Did the trial court commit and abuse of discretion and/or error of by offering no new findings of facts and opinion, or any kind of explanation, for reversing its initial decision and issuing the reconsidered order?

Simply stated, the Oder at issue needed no additional evidence or Findings of Fact and Opinion as it was simply correcting an error. The purpose of a motion for reconsideration, as was filed in this case, is to allow the trial court to review its prior decision for error. See, Gemini Equipment v. Pennsy Supply, 595 A.2d 1211 (1991) (reasoning that purpose of a motion for reconsideration was to have trial court review its decision). In fact, the basis of Father's Motion to Reconsider was that this Court erred in issuing the Order granting partial physical

3

R 55?

custody to Mother on the basis that this Court's Findings of Fact and Analysis of the 16 Factors did not support its Order.[2] Upon review, this Court Agreed.

The determination of whether additional testimony, briefs or argument are necessary to reassesses a prior order pursuant to a motion for reconsideration lies within the trial court's sound discretion. Moore v. Moore, 634 A.2d 163, 167 (Pa. 1993) (explaining, "Since a motion for reconsideration is addressed to the sound discretion of the trial court, the trial court is obviously in the best position to decide if additional testimony, briefs or argument are necessary to the court in reassessing its original order.") Father's Motion to Reconsider required only the consideration of the then-existing record. Father asserted that the original Order was not supported by the Court's Findings of Fact and Analysis of the 16 Factors. Consequently, this Court took no additional evidence. In fact, if the Trial Court had chosen to take additional evidence or testimony, as Mother now asserts, this Court would have committed an abuse of discretion in doing so as it would exceed the scope of Father's Motion to Reconsider.

Furthermore, no authority exists requiring the court to re-file or reissue its Findings of Fact or 16 Factor Analysis when correcting an erroneous order based upon these filings. The only support for the Order at issue was the previously filed Findings of Fact and Analysis of the 16 Factors. To require the trial court to issue "new" Findings of Fact and Analysis of the 16

---

[2] In is interesting to note that Mother has not asserted that the record supported this Court's initial Order granting her partial physical custody. As in fact, it did not. This Court specifically found in its Findings of Fact and in its 16 Factor Analysis, pursuant to the second factor, that past abuse of the Child had occurred and was committed by member of Mother's household, that there is a continued risk of harm to the Child, and that Father could better provide adequate physical safeguards and supervision of the Child. Pursuant to Mother's 5th Matter Complained of on Appeal, Mother admits that this factor weighs against her.

4

Factors, which would be identical to those previously filed, would do nothing more than put form over substance in an already over-taxed court system. Consequently, the Trial Court committed no error of law or abuse of discretion in issuing the Order at issue.

Mother next asserts in her Concise Statement:

3. Did the trial court commit and abuse of discretion and/or error of law when it simply signed Father's proposed reconsideration order without making changes, even including the same clerical errors and Father's certificate of service, and not attaching the general custody policies?

Mother's 3rd Statement of Matters Complained of on Appeal is wholly without merit and continues to attempt put form over substance. Again, Mother does not claim that the Order is not supported by this Court's Findings of Fact or Analysis of the 16 Factors. Rather, Mother challnges the Order on the basis that the Trial Court did not draft its own order, but adopted Father's proposed order after an examination of the Court's Findings and Analysis of the 16 Factors.

Courts are permitted to adopt a party's proposed order if the court agrees with the terms of the order. This has been a common practice for centuries. No requirement exists for a court to "make changes" to a proposed order prior to signing. To require so, would only increase the burden on an already over-worked court system.

Mother's vague allegations of clerical errors and failure to attach policies provide no basis to establish an abuse of discretion or error of law. Again, Mother has alleged no harm resulting from any specific clerical error or failure to attach the policies. In fact, Mother has not even identified what the alleged clerical errors are, other than the inadvertently attached copy

5

of Father's Certificate of Service. Nonetheless, the claims of error provide no basis to reverse this Court's Order. Trial courts are permitted to correct clerical errors which are clear on the face of the record and do not require an exercise of discretion. Consequently, these errors cannot serve as a basis to vacate the Order at issue and reinstate the erroneous order to provide Mother increased custodial time as she is seeking.[3] Stockton v. Stockton, 698 A.2d 1334, 1337 n. 3 (Pa.Super.1997). This outcome would only serve to elevate form over substance, which is certainly not in the best interest of the Child.

Mother next issue presented provides:

> 4. Was it contrary to the best interests of the child to reverse itself and reduce and limit Mother's partial physical custody, after the court had allowed the Child to have additional partial physical custody with Mother for four months, and where there was no new evidence suggesting any harm had come to the Child from the additional partial physical custody time with Mother.

Mother's position is based upon the flawed premise that the additional partial physical custodial time erroneously awarded to her in the initial order was proper and supported by the Findings of Fact and the Analysis of the 16 factors. In fact, it was not. The fact that she experienced partial physical custody time based upon an Order that was not supported by the record does not give rise to a basis to continue this time.

---

[3] While the Court has the authority to correct the clerical errors at this moment, it would prefer to wait until the Superior Court address this appeal so as not further muddy the waters in this already convoluted case.

6

Moreover, Mother's contention that the partial physical custody should continue simply because "no *new* evidence [has been admitted in Court] suggesting any harm had come to the Child" while in Mother's care, is not the standard. First and foremost, the this Court did not base its Order on any new evidence, rather was based on the *old evidence of harm that occurred while in Mother's care*, as mandated by the second factor of the statutorily required 16 Factor Analysis. Again, Mother concedes in her 5th issue that this factor weighs against her. It has never been the law of this Commonwealth that the Courts are required to place a child in harm's way and sit back and wait for *new evidence to emerge* that a child has been victimized again when there has been a history of harm. To do so would fly in the face of the best interest standard.

Mother's fifth and final Statement of Matters Complained of on Appeal requires a consideration of the procedural and factual history of this case. In her final claim, Mother asserts:

> 5. Did the trial court commit an abuse of discretion and/or an error of law by reducing and limiting Mother's partial physical custody where the following §5328(a) factors were neutral or in Mother's favor: (1), (3), (4), (5), (7), (8), (9), (10), (11), (12), (13), (14) and (15).

On September 13, 2013, Father filed a Complaint for Custody averring, inter alia, concerns of Mother's parental capacity to protect Child from sexual abuse perpetrated by her half-sister, H.G., who had previously been sexually abused by her brother, Edward.

7

D CC

Additionally, both parties have filed numerous petitions and motions regarding custody, including petitions for protection from abuse pursuant to 23 Pa.C.S.A. §6101-6122.

Prior to the initially scheduled trial dates in 2014, the Court was forced to continue the trial to permit the Butler County Children and Youth Services Agency ("Agency") to investigate claims of sexual abuse between H.G. and Child. As a result of these allegations, the Court appointed Rebecca Lozzi, Esq. as the guardian ad litem for Child ("GAL")[4] on October 15, 2014. Although the Agency did not make an indicated finding of abuse, H.G. subsequently acknowledged that she engaged in inappropriate sexual conduct towards Child.

Following a five-day trial on October 27, 2014, October 28, 2014, October 29, 2014, November 24, 2014, and November 25, 2014, the Court entered an Order[5] granting Father primary physical custody, subject to Mother's partial physical custody.

A custody trial was scheduled for August 25 and 26, 2014. After the presentation of a Motion to Continue the case to allow Butler County Children and Youth Services ("CYS") to conduct their investigation, an Order of Court was issued on August 25, 2014 granting said Motion. The same Order of Court also directed Mother's custody time to take place two times per week for two hours, either supervised or in a public setting. Mother was not permitted any overnights with Child. Lastly, the same Order prohibited Mother's oldest son, Edward, from being around Child at any time, for any reason. The five day custody trial was held on October 27, 28, and 29, 2014, and November 24, 2014.

___

[4] 23 Pa.C.S.A. §5334

[5] The initial custody order was issued on January 2, 2015. A Motion for Reconsideration was expressly granted. The final custody order was dated June 29, 2015. Mother filed a tiemly appeal on July 6, 2015. The Pennsylvania Superior Court affirmed this court's decision.

8

P 55

The court made the following findings of fact.[6]

There have been two referrals to CYS to conduct investigations into the allegations of sexual abuse against Child. In September of 2013, CYS received a call reporting sexual abuse of Child, naming Father as the perpetrator. This report was numbered. After an investigation ensued, CYS concluded that the report was unfounded.

However, Child was masturbating excessively in public and continuously "rocking." In August of 2014, another CYS investigation was conducted after a report was received alleging sexual abuse of Child this time naming Child's sister, *H.G.* ████, as the perpetrator.[7] However, due to the age of the alleged sexual abuser, CYS investigated the ability of Mother and Father to keep Child safe in the home rather than the criminal nature of the allegations. CYS intake investigator, Sue Counts, interviewed all of the *G.* ████ children, Child, Father and Father's paramour, Mother, *K.G.* ████ and his paramour. Ms. Counts interviewed Child two times. During CYS' interview with Mother, Mother acknowledged that Child "rocks" and Mother began to discuss matters in front of *H.G.* ████ that Ms. Counts believed to be inappropriate for Child to hear. Ms. Counts stopped the discussions. Also, Mother explained to Ms. Counts that after consulting with the Child's pediatrician, Mother chose to ignore Child's rocking and masturbation believing Child would out-grow the behaviors.

Ms. Counts also interviewed *H.G.* ████. *H.G.* ████ was "extremely emotional" during the interviews and expressed her fear of Mother's reaction to the situation. *H.G.* ████ expressed to Ms. Counts that Mother told her she should not have said anything about the incident with Edward.

---

[6] For context, the findings of fact from the first custody trial are set forth.

[7] This report was not numbered.

9

P 550

However, when Ms. Counts sat down in a meeting with Mother and ~~K.G.~~ [K.G.], ~~H.G.~~ [H.G.] denied that Mother ever told her that she should not have said anything.

During the interviews with Mother's other children, they expressed their observation that Child had been masturbating for "as long as they could remember." Furthermore, ~~H.G.~~ [H.G.], Henry and ~~A.G.~~ [A.G.] reported bullying by Edward, and that Mother would take sides with Edward. Mother failed to redirect Edward when he acted out. Furthermore, when Edward was interviewed he expressed knowledge of the allegations of sexual abuse by ~~H.G.~~ [H.G.] to ~~CHILD~~ [CHILD] that he should not have been privy to. Ms. Counts concluded that Mother was providing him information.

Ms. Counts further testified that when interviewed, Edward stated that he stayed mostly at Mother's home or at friends' homes. However, Edward testified before the Court that he stayed at his father's home fifty percent of the time. This Court found Edward's testimony not credible on that issue. Ms. Counts expressed concerns about the hostility, secrecy, and denial within the family. Mother was hostile during her interviews in 2013, and denied that there were any issues with Edward. Furthermore, ~~H.G.~~ [H.G.] expressed that she should never have talked about "the incident" which raised concerns with Ms. Counts. After CYS' observations of the home, it was concluded that there were no safety issues at Mother's or Father's respective homes. CYS recommended follow up services at Clover for Edward[8], sexual programs at Allegheny General Hospital for Child, play therapy for Child, individual counseling for ~~H.G.~~ [H.G.] and that the children were not to be left alone. Furthermore, it was recommended that Child, Mother and Father should have separate psychological evaluations.

---

[8] During the Armstrong CYS investigation, it was recommended that Edward seek treatment at Clover. It was later learned, during the Butler County CYS investigation that Edward never completed his treatment. It was also reported that Mother was not cooperative in assuring compliance and completion of Edward's treatment.

10

P 556

Ms. Counts indicated that the parties are trying to address the issues through the custody system and, therefore the safety threat is being addressed. CYS concluded that no parent wants any child to be hurt, but they are having difficulties in reaching an agreement on how to ensure Child's safety and the safety of the other children, and that their hope is that the Court will help to set up guidelines for them to follow. The investigation by CYS was concluded by an agreement between the parties that Child begin services. Mother and Father were taking the steps necessary to implement appropriate services for Child.

A new allegation was made on November 4, 2014 alleging Child had been sexually abused by H.G. . This report was made by Child's AGH therapist after Child revealed H.G. had contact with Child's "private parts". There is no evidence as to whether this was a new act or the report of a prior act. Ms. Counts testified that CYS currently has an open case with the family and, is developing a Family Service Plan. Ms. Counts recommended that Child continue with therapy at AGH and Mother, Father, and all the children have a psychosexual evaluation. Furthermore, she recommended that Child and H.G. have no further contact until this was "worked out".

Christina Totin, licensed therapist and director of Totin Family Services, was involved in home visits with the parties. Mother and Child were referred to Totin Family Services for supervised visits. Ms. Totin visited Mother's house "two to three" times. She discussed with Mother the importance of not involving the children with adult issues, and that the issues should remain between Mother and Father. Mother was very upset during her visits because she thought

11

D 56

the services were put in place to help her family, but didn't think [she] was getting much help." She became threatening to the point where Ms. Totin felt unsafe and had to leave the home.[9]

_M.D._ is the Paternal Grandmother of Child. She observed Child's masturbation on several occasions and attempted to redirect Child. She reported that the behavior of Child has lessened over the last several weeks. Paternal Grandmother has observed Child and Father's paramour, _A.A._ together and indicated that _A.A._ is "very good" with Child and has no concerns for Child's safety or well-being with _A.A._.

Father met his current girlfriend, _A.A._, in 2013. Father introduced _A.A._ to Child in December of 2013 as a "friend." She has two children, ages 15 and 11. On the weekend of July 4, 2014, _A.A._, Father, Child and _A.A.'s_ two children went on vacation to Washington D.C.. During that trip, Child talked a lot about the game of "love and touch" where "love and touch live in your underwear and they scurry around the lower section of your body."[10] This caused _A.A._ concern. During the same vacation, _A.A._ also observed Child masturbating; however, at that time, it was not excessive.

_A.A._, Father and the children went on another trip at the end of July 2014, to Orlando, Florida where _A.A._ has a time share. During that trip, Child's masturbation became excessive in that she was masturbating all of the time regardless of whether it was in private or public. _A.A._ addressed the situation at that time because her children were becoming "very confused, upset, and looking for guidance." When _A.A._ tried to redirect Child, Child got angry and responded that "my mommy likes it when I do this." Her behavior continued throughout the vacation. Upon

---

[9] Ms. Totin testified that Mother was "in her face" and "throwing her arms in the air in a threatening manner" and that she no longer felt "welcomed" in the home. _A.A._

[10] How Child described the game as reported by Father and _A.A._

returning from their vacation, Father and *A.A.* met with Father's counsel to discuss the situation. *A.A.* indicated that, if Father were to need it, she would be able to assist him with the day-to-day childcare.

*K.G.* is the father of Mother's other children, not at issue in the instant matter. He and Mother never married and have four children together. They share custody with the children on a week on, week off basis. Edward and *H.G.* were in his care when the sexual abuse between the two children occurred. At that time, Mother was residing in Mississippi. She returned to Pennsylvania in December of 2009. Father indicated that Edward began his treatment at Clover and was subsequently released from the program, but he did not finish.[11] The other three children were required to go to victim counseling.

Currently, through an Order of Court in Armstrong County, Mother and *K.G.* share custody of their children on a week on, week off basis; however, Edward does not follow that schedule. Contempt actions were filed in Armstrong County regarding the custody schedule of Edward, where *K.G.* alleges that Mother allows Edward in her house on *K.G.'s* weeks. Father testified that before his separation from Mother, she would insist that he lie to police about the whereabouts of Edward. The Court has concerns that Mother is allowing Edward in her home around Child.

During his testimony, *K.G.* informed the Court that, at times, Edward "can be a bully" and that Mother does not keep him informed on the major issues in the children's lives. For example, Mother did not inform Father [12]that Henry was hit by a car while riding his bicycle.

---

[11] Edward was discharged from the program due to poor attendance.

[12] Father here is *K.G.*

13

Mother does not inform him of school activities or of changes in their schedules. K.G. [redacted] further indicated that the children bring up adult issues with him, in that they have inquired why he is being a "problem" for Mother. He concluded that Mother discusses inappropriate topics around the children.

Mother currently resides approximately 25 miles from Father's residence and is currently employed at the Freeport School District. She currently resides in the home where Father and she resided while they were an intact couple.

During a time when Father and Mother were still an intact couple, Mother wanted to pursue custody of H.G. [redacted] and A.G. [redacted] however, Father was only agreeable to pursuing custody of H.G. [redacted] not A.G. [redacted] Mother, on the other hand, did not want to split up the twins.

All five children were residing with Mother until August of 2014, when Child stopped living there. Mother indicated that she is willing to make whatever accommodations are required by the Court to have more time with Child. When Mother was having overnight visits with Child, she would sleep in the bottom bunk with H.G. [redacted] and Child would sleep in the other bunk bed. Edward had his own room, and Mother placed a door alarm on the door so that she knew if Edward ever left his room. She never left Edward alone with the children during the day.

Mother typically took Child to her medical appointments, but sometimes Father would take her. In May of 2014, Mother received an email confirming a doctor's appointment for Child of which Father did not inform Mother. Mother went to the doctor appointment, and Father became upset that Mother was there and advised the doctor that Mother should not be in the room with Child. Mother was able to attend the appointment and stayed in the exam room with

14

Child through the appointment. Child had another doctor's appointment on October 16, 2014. Father informed Mother of the appointment through Our Family Wizard. Mother was in the waiting room when Father and Child arrived, and Child sat with Mother until her name was called. Father announced to the waiting room and doctor that Mother was not allowed to go into the exam room with Child.

An incident occurred sometime prior to August 30, 2013 where Father pushed Mother and she fell into the bunk bed. Mother sustained bruises on the back of her legs from the incident. On August 30th of 2013, Mother locked Father out of the house and put his belongings in the garage. She e-mailed Father to inform him that she had locked him out of the home. Cross-PFAs were filed by both Mother and Father. Custody exchanges were occurring at a third-party location. Mother was not agreeable to custody exchanges being held at her home because she felt Father was a safety threat.

Mother testified that Child would "rock" when she was tired until she would fall asleep. If Child did not fall asleep, Mother indicated that she would redirect Child. In September of 2013, Mother spoke to Kids Sprout about Child's "rocking" at daycare. Child's behavior was upsetting the kids and teachers at Kids Sprout. Mother stated that she was surprised to hear about Child's behavior. Mother testified that she never had trouble with redirecting Child and began putting pants on Child rather than dresses. Mother never noticed anything other than the rocking. There was one time in July of 2014 that Mother recited where Child would not stop "rocking." She indicated that this was the first time Child behaved as such and Child has never behaved in such a way since. The Court finds that Mother is not credible when discussing Child's behaviors. The Court further finds that Mother is in denial about the degree to which Child is acting out.

15

D 565

Currently, Mother visits with Child every Tuesday and Thursday from 5:00 p.m. until 7:00 p.m. at the Clearview Mall in Butler. Mother wishes to return to the custody schedule prior to Father getting primary custody. She desires to maximize her time with Child and is willing to abide by any court orders to make that happen. The Court recognizes that Mother loves Child and does not wish to put Child in danger, but Mother has a difficult time appreciating the boundaries that need to be in place to protect Child.

When Father and Mother moved to Mississippi in September of 2009, they were engaged. They moved so that Father could pursue his education in the creative writing program. Father and Mother returned to Pennsylvania around Christmas of 2009. Mother remained in Pittsburgh to stay close to her other four kids due to the abuse perpetrated by Edward and against H.R. Child was born on September 9, 2010. At that time, Father was living in Mississippi. He came back to Pennsylvania for some time to be close to Child and Mother. In January of 2012, Father returned to Mississippi to finish his schooling. From the time Child was born until Father left for Mississippi, he was the primary care provider since he was not working, but staying at home to study. Both Mother and Father provided for Child at that time. If Father was not able to care for Child during the day, such as the times when Father was studying for finals, Child would attend Kids Sprout. While Father was living in Mississippi, Child remained in Pennsylvania with Mother and attended Kids Sprout when Mother was working. During the summer of 2012, Father was in Costa Rica for a study abroad program. At the end of summer of 2012, Mother and Child went to Costa Rica to visit Father. All three of them returned to Pennsylvania together in July of 2014.

16

When Child was born, Mother and Father agreed that Child would not be around Edward and that Edward would cease living with Mother. During Mother's weeks of custodial time with Edward, he would stay at Maternal Grandmother's house. A custody complaint was filed by ▪. K.G. in Armstrong County and "all of a sudden it became very import to Mother to have Edward back in her home." Mother's and Father's relationship began to deteriorate when Mother wanted Edward to live with them. Father did not want Edward around Child and therefore, Mother threatened to throw Father out.

Child required surgery for her ear infections. Father scheduled Child for surgery following the recommendation by Child's doctor. Mother did not attend the surgery and told Father that, "if [he] needs help, [he] better ask [his] mother" and that Father "stupidly scheduled the surgery" because they were going to have high deductibles. Father concluded that Mother does not like medicine.[13]

Father currently resides in a two bedroom home in Butler, Pennsylvania with Child. Father is currently employed with Butler Community College as a professor. Father has a Bachelor's Degree in writing from the University of Pittsburgh as well as a Masters in fine arts. He also holds a PhD in creative writing from the University of Southern Mississippi. Father writes and publishes his material. Mother expressed concerns as to the content of Father's books, stating that they were sexual in nature; however, Father indicated that only approximately three percent of his work is sexual in nature.

---

[13] Taken from Father's testimony on August 23, 2014.

17

R 567

Father's parents love Child unconditionally and are very excited to have a grandchild close. Paternal Grandmother has been very helpful in assisting Father with daycare when he began having Child full-time. Father and A,A. spent two nights together with Child at Paternal Grandparents' home on advice of counsel out of fear that Mother would "act out" and come to Father's home once he received sole physical custody.

Father sought out individual counseling for himself as well as for Child. Father is willing to participate in counseling with Mother and to participate in individual counseling for himself. He has been working with Child on teaching her the difference between "private parts" and "public parts" and "appropriate touch" and "inappropriate touch." Child, in Father's opinion, has decreased her behaviors "drastically."

Currently, other than her behavioral issues which seem to have decreased over time, Child is doing well. She has a routine at Father's house every day of the week. She picks out her own clothes, but Father does not allow her to wear dresses any longer. Father indicated that, since Child has ceased wearing dresses, the masturbation has been at a minimum. Child is surrounded by family and friends who help support her and help redirect her behaviors when necessary. Child attends daycare at BC3 where Father works, and she is doing well there.

Dr. Eric Bernstein was appointed to conduct custody evaluations on November 18, 2013. Some delays occurred due to Mother's lack of funds to pay for the evaluations, and Father's need for advance notice to be able to attend the appointments. It is noted by the Court that Dr. Bernstein interviewed the parties and conducted his custody evaluations prior to the CYS investigation into the sexual abuse allegations. Dr. Bernstein met with the parties, Father's girlfriend, K.G., and Mother's other children—Henry, A.G., Edward and H.G..

18

After the psychological testing of Father, Dr. Bernstein concluded that he is a well-functioning adult with a strong attachment to Child. Dr. Bernstein concluded that Mother was overly guarded in the information she wanted to share, but there were no concerns with Mother's mental health. Mother is well bonded with Child. According to Dr. Bernstein's observation of the issue of sexual abuse between Mother's oldest child and *H.G.*, it seemed as though the issue has been discussed and is no longer an issue. Mother stated that she closely supervises all of the interactions between the children, especially Child. Dr. Bernstein, however, doubted the statement that Mother closely monitored the children because "even the best parent cannot be in the presence of the child at all times." Dr. Bernstein opined that it is not realistic for a parent to constantly monitor a child or children at all times, and considered that *H.G.* acted in a babysitting role to Child as reported by Mother's other children. Furthermore, Father and *K.G.* had concerns on how closely Child is monitored in Mother's home. Dr. Bernstein received information about "the incident" through Mother, Father, and *K.G.* Edward also admitted to one incident between he and *H.G.*

With regards to Mother's other children, Dr. Bernstein recommended that *H.G.* receive in-home family counseling due to the concern for risk of harm towards Child and/or any other child in the home; that Edward attend psychological therapy sessions with someone who deals with sexual abuse offenders; and that the parties attend counseling to help deal with their issues.

The Court appointed Guardian Ad Litem, Rebecca Lozi ("GAL"), to represent Child's best interests. She visited both Mother's and Father's home and spoke to both parties on multiple occasions. The GAL spoke with Mother about the alleged sexual abuse and indicated that

19

P 559

Mother exhibited minimal concern for Child, sympathy for Edward and blame towards Father. Mother did not express any sympathy for H.G. [redacted] or Child.

The GAL expressed concerns about Mother's ability to keep Child safe. Specifically that Mother is not a physical harm to Child but that, when it comes to protecting Child versus getting in trouble if a violation of a Court Order were to occur, the GAL does not believe that Mother would protect Child. The GAL is not comfortable, at this time, allowing Child to be around Edward and/or H.G. [redacted] unless it is cleared by both of their respective counselors and/or supervised by a mutual third party. However, the GAL indicated that Mother should have some custody time in her home if the other children are not present. There is an ongoing fear that, once Edward turns eighteen, Mother will have no control over whether or not he is present when Child is in the home.

The parties continued to litigate matters while the 2015 appeal was pending. On February 2, 2016, Mother filed a Petition for Contempt and Special Relief as well as a Petition to Oppose Relocation. The petitions were denied on April 21, 2016, and no appeal was filed. On May 12, 2016, Father filed a Petition for Special Relief and a Petition for Contempt which was scheduled for a hearing. However, more pleadings continued to be filed. Mother filed a Petition for Special Relief-Custody and Father filed a Petition for Enforcement, Contempt and Special Relief. All petitions were consolidated for a hearing held on November 7, 2016. No appeal was filed from this court's order of December 22, 2016.

Pursuant to Butler County Local Rules of Civil Procedure the modification was scheduled for a custody conciliation on October 17, 2016. At the custody conciliator's

20

recommendation , the conciliation was continued until November 22, 2016, to effectuate proper service of the petition on Father and the GAL.

Following status conferences on March 9,2017 and June 8 , 2017, the parties agreed to updated custody evaluations and a pre-trial conference was set for December 4, 2017.[14] The custody evaluation was not completed, so the conference was continued to March 26, 2018, and trial dates set.

On November 8, 2018, the Court's findings of fact and memorandum were filed. On December 6, 2018, Father filed a Motion for Reconsideration which was expressly granted. No additional testimony or evidence was placed on the record. On March 12, 2019, the Court entered its final custody order. Mother timely filed the instant appeal.

The Court's findings of fact as filed on December 8, 2018, are as follows:[15]

Child is seven years old and attends first grade at Moraine Elementary School in the Slippery Rock School District. Child is aware of the constant conflict and custody litigation between her parents, in part, because Mother continues to inappropriately discuss custody issues with Child specifically relating to Child's relationships with her half-siblings.

Child has been diagnosed with Adjustment Disorder and has been attending individual therapy with Dr. Annie Preis, a licensed psychologist, since June 15, 2015. Child appears to benefit from therapy particularly as it relates to the trauma associated with her sibling relationships. Child continues, however, to exhibit rocking or masturbatory behavior and other

---

[14] The scheduling order refers to a "status conference" however the conference met the requirements of a pre-trial conference pursuant to the Pennsylvania Rules of Civil Procedure.

[15] The substance of the findings remains unchanged. Minor grammatical and clerical errors have been corrected.

21

R 571

inappropriate sexualized behaviors as she did prior to the last trial in 2014. Mother denies that Child masturbates or "rocks" during her custodial time. However, both Child's kindergarten and first grade teachers observed her masturbate at school. Child was easily redirected by the teachers. Father's paramour testified that Child frequently masturbates and inappropriately kisses and touches her. This information was shared with Child's therapist.

Father lives in a five-bedroom home in Prospect, Pennsylvania with his paramour, ▮▮▮ A.A. ▮▮▮▮, and A.A.'s ▮▮▮▮ two children. Father and A.A. ▮▮▮▮ have dated for approximately six years, and have lived together for approximately four years. Since the last trial, Father has participated in therapy with Robert Miller of PBS Mental Health Associates. At the beginning of his therapy in February 2015, Father was attending therapy bi-weekly, but now attends on a monthly basis. Father reports that he has benefited from the therapy as it relates to parenting skills and co-parenting techniques.

Father works as an adjunct professor at the University of Pittsburgh and the Butler County Community College. Father's work schedule is flexible; however, A.A. ▮▮▮▮ is able to provide childcare during evenings when he is teaching. Father's parents, J.D. ▮▮ and M.D. ▮▮▮▮ ▮▮▮▮, live in Windber, Pennsylvania and also provide Father with childcare on occasions, and are actively involved in Child's life. A.A. ▮▮▮▮ observes Child masturbate frequently following Mother's custodial period. Child will inappropriately kiss A.A.'s ▮▮▮▮ neck and touch her breasts. She states that she and Father encourage Child's relationship with Mother. The Court finds her testimony credible.

Father was in therapy as directed by the Court. However, he did stop attending for a period of time and resumed following a status conference.

22

Father does not communicate well with Mother. Father did not invite Mother to Child's kindergarten teacher's meeting. Father admitted to taking pictures through Mother's living room window, and failed to respond to Mother's Our Family Wizard email regarding same.

Father has no objection to Mother's religious training of Child. However, he was evasive in answering whether he would agree to Child participating in first communion. Father is not entirely credible as to his willingness to communicate with Mother and support her religious training of Child.

Father testified that he has no mental health diagnosis.

Father admitted to writing a "role play by adults" story approximately twelve years ago. The story is sexually explicit regarding child/parent sexual acts. He also wrote a published story regarding a husband cheating on his wife that he described as "magic realism".

Mother lives in a three-bedroom home in Sarver, Pennsylvania, approximately forty-five minutes away from Father. Mother works as an administrative assistant for the Freeport Area School District on a full-time basis and also works part-time cleaning offices.

Mother has been attending bi-weekly, individual therapy with Susan C. Thompson, L.C.S.W. of Allegheny Associates in Psychiatry since December, 2014. Thompson reports Mother's general progress and treatment goals relating to Mother's own self-esteem. However, Thompson acknowledges Mother's therapy does not address any issue relating to the abuse that occurred to Mother's children. When asked why Mother's therapy did not include a treatment goal or treatment plan relating to the abuse issues, Thompson indicated that she was not provided all of the information from Mother regarding the abuse. Mother has failed to provide credible evidence that she has addressed her attitude and insight in the sexual abuse between Edward, H.G. and Child. Consequently, Mother also failed to provide credible evidence that she has the

23

insight and willingness to put protective boundaries in place for the safety and well-being of Child. Mother testified that the reason Children and Youth Services made a founded report of abuse regarding Edward and H. G. was because Edward acknowledged he was babysitting H.G. She went on to say that Edward's Father, K.G., was responsible for Edward's treatment following the abuse, and that, "it was K.G.'s fault" that Edward did not complete his treatment plan.

Mother enjoys the added supports from her extended family, particularly her brother and sister-in-law. Maternal Uncle testified that the family comes together for events approximately 15 to 20 times per year. However, he stated that his interaction with Mother's children has decreased. Similar to his testimony at the first trial, he admitted that he is not aware of the details regarding the sexual abuse between Edward and H. G., and was not aware of any alleged abuse between H.G. and Child. He explained that "Mother's private and I didn't ask a lot of questions." Despite the results of the last custody trial, he continued to be unaware of the allegations and did not appear to be interested in gaining more information, even for the well-being of his own children. He simply states that, "our kids are never alone." Conversely, Mother's sister-in-law did testify that she was aware of the sexual abuse between Edward and H.G. Maternal Grandmother did not testify. Although Mother's family is very supportive of her and involved in Child's life, it is clear that they are either unwilling to accept or have not been provided all of the details regarding the sexual abuse between Mother's children.

Child has four half siblings. Since 2015, H.G. has participated in individual therapy to address her prior sexual abuse at the hands of her brother. Her therapist was made aware of the allegations of sexual behavior by H.G. toward Child. At this time, H.G. has resolved issues as to her own abuse and does not identify as a victim. However, she is dealing with the grief and loss

24

associated with her separation from Child, and feels responsible for the current custody provision. H.G. is a junior in high school and works part-time at the Giant Eagle located directly across the street from Mother's home. She is involved with extra-curricular activities and, specifically, plays soccer for the Freeport Area Soccer Association. She presented as a well-spoken, polite young lady who spoke in a methodic, thoughtful tone. She did not appear nervous, but rather prepared for the situation.

H.G. described that she never had an intent of hurting her sister, but rather had a "curiosity about breast feeding" when she attempted the act on Child. She denied that she ever "touched her sister inappropriately," despite Child's disclosure that H.G. touched her private parts in November of 2014. She further explained that prior to speaking with Mother's attorney on this most recent litigation, she was "not sure of the allegations" of sexual activity with Child.

H.G. described her three-year counseling sessions as being primarily to discuss and resolve stressors H.G. may be experiencing such as school or issues with her father. She describes the relationship with her father as tense, but improving. She believes that her father and J.S. ██████████ turned against her after the 2014 custody trial. She testified that she has briefly discussed the prior sexual abuse from her brother, Edward, and explained, "and now we are happy and we don't think about it anymore... [it is] not our concern anymore...like my family and I, we don't worry about it anymore." H.G. did not testify as to resolving or discussing any issues related to Child not having contact with her.

Henry is 19 years old and resides with Mother except during her custodial periods with child when according to Mother he usually stays with his father. However, according to ████ J.S. ████████, he often leaves his father's home and secretly returns to Mother's home or otherwise meets Mother and Child. J.S. ████████████ was credible in her testimony. A.G. is H.G.'s twin

25

brother and is 17 years old. A.G. is obsessed with Child according to J.S. He is exhibiting behavior issues at school, leading to assault charges, and has drawn explicitly sexual "beasts" performing sexual acts. He is currently on probation.

J.S. described the relationship between H.G. and K.G. as physically aggressive by H.G., constantly running away from custody and that H.G. shut down until approximately five months prior to trial where she dramatically changed in attitude, and she would leave notes for K.G. to call the custody evaluator. J.S. testified that there is now conflict between H. G. and her father. J.S.'s testimony was very credible.

Mother and Father communicate via Our Family Wizard. However, they do not communicate well. Mother and Father had difficulty agreeing to Child's therapist, however ultimately they agreed to Dr. Pries. The Our Family Wizard exhibits show that Father reads Mother's emails, but does not respond to them despite several requests for information which should be shared between the parties such as school folder exchanges, doctor's appointments, and daycare information. In November of 2015, Father was taking pictures through the living room window in Mother's home. Father provided no explanation after Mother's request.

Butler County Children and Youth Services conducted an investigation in July, 2017, which was deemed unfounded.

Mother denies observing any regressive behaviors by Child while in her custody. She denies discussing custody issues with Child. Mother calls Child by a different name than she did in 2014, and different from what Father calls her. Mother attends most medical appointments with Father and Child. Mother describes Child as willful.

D 57C

Mother's testimony was often unresponsive to the questions asked. Mother's testimony was very negative regarding Father, and she did not reveal any admirable qualities of Father or his parenting. Mother refers to Child's clothes as "mommy clothes" and "daddy clothes".

Additionally, according to the principal at Child's school, Mother is rude and constantly communicates with the school secretaries wanting information from the school even though she has been directed by the principal and the school superintendent to stop communicating with the secretaries. Father appropriately communicates with the school.

Mother's Our Family Wizard exchanges also demonstrate that Mother will continuously ask Father the same questions over and over. However, it appears that Father does not always respond to her. Mother requested that Father inform her on Our Family Wizard of when Child last ate prior to custody exchanges. Father has not met her request.

Extra-curricular activities continue to be an issue between Mother and Father. Mother is secretive, and does not discuss with Father enrolling Child in activities prior to doing so. Currently, Mother enrolled Child in soccer without discussing it with Father, however, Child can not attend the practices and only attends games when in Mother's custody. Mother did provide Father with the game and practice schedule. Father does not take Child to either during his custodial period.

Mother's unwillingness, or in the alternative, inability to understand and appreciate the serious nature and safety concerns as it relates to Child's interactions with her siblings is, and has always been, the principle point of conflict between the parties. Father alleges that Mother routinely permits her other children to be around Child without Father's knowledge or the Court's permission.

27

R 577

K.G.'s fiancé, J.S.

_____ _____, has lived with **K.G.** for six years. Over the last two years, **K.G.** and Mother have exercised shared custody over their children. During that time period, **J.S.**, whom the Court found to be credible, recalled several occasions where one or more of **K.G.'s** children were unaccounted for, and, on at least two of those occasions were found to be with Mother while she was exercising custody over Child – in direct violation of this Court's Order. Conversely, Mother denies permitting her children to be around Child without Father's knowledge; however, the Court does not find Mother to be credible in this regard.

Mother continues to minimize the sexual abuse suffered by her children. In fact, Mother testified that H.G. "complied" with Edward's abuse, thus implying that H.G. is not a victim of rape. Mother continues to minimize the impact of the trauma caused to Child by highlighting the fact that Children and Youth Services could not classify H.G.'s actions as "abuse" because of H.G.'s age at that time. To that end, when prompted by the Court to wait until H.G. exited the courtroom before testifying about the sexual abuse that H.G. endured, Mother, with H.G. still in the courtroom, indicated that she felt comfortable testifying about what happened between her children in front of H.G.

Child's Guardian Ad Litem testified that she met with Child at least eight times since the previous trial. She explained that Child experienced grief and loss following the 2014 trial. She testified that Father was not sensitive enough to Child's grief and loss and Mother feeds it. She explained that Child understands and acknowledges that conflict between Mother and Father which creates a stressor for Child. She is aware of adult issues including Mother's views on the custody matters. Child expresses guilt for the outcome of the 2014 trial and Mother's reduction of parenting time. Due to Mother's emotions and the conflict between Mother and Father, Child expressed that she no longer feels comfortable confiding in Father. The Guardian Ad Litem

28

D 57(

opines that Child benefits from her therapy with Dr. Pries and should continue to participate. She also opines that Father needs insight into Child's need for more of a relationship with Mother.

The parties participated in a custody evaluation with Dr. Eric Bernstein, Psy. D. As a result of the evaluation, Dr. Bernstein rendered his opinion to a reasonable degree of psychological certainty making the following recommendations to the Court:

1. [Father] should retain primary custody. [Mother] should receive custody every other weekend from Friday through Sunday. In addition, [Mother] should receive two evenings per week. The evenings allow for opportunities to give more input into [Child's] everyday activities and education. I am mindful of the distance between the parents['] homes as well as [Mother's] custodial time with her older children. By having evenings rather than overnights, [Child] will be less burdened with transition between homes.

I do not support [Mother] receiving supervised visits. While there are allegations of her photographing her daughter in the nude and inappropriate parent/child boundaries, the allegations are not substantiated.

2. The parents should continue usage of OFW as a resource and communicate on a weekly basis.

3. Each non-custodial parent should receive daily phone contact with [Child].

4. Both parents should attend individual counseling as per the Court's Order.

5. [Child] should continue attending counseling as per the Court's Order.

6. All adults should refrain from pressuring [Child] with adult related information and pertaining to the separation from her siblings. The therapist is in a more appropriate position to discuss [Child's] feelings and thoughts about the custody matter, should such issues arise.

7. Upon receiving information from Dr. Ann Preiss, I will issue an addendum, should the new information affect the recommendations.

8. I defer to the Court to determine about sibling contact.

9. Reconsideration should be an ongoing process, assessed with input from the child's therapist, GAL, and of course, the parties as well.

29

R 570

Father's Exhibit 1, at 19-20.

Dr. Bernstein completed a full custody evaluation with the family and issued a report on March 1, 2018. The Court requested, and all parties consented, and addendum to the report considering collateral information from Dr. Pries, Child's therapist. An addendum was issued on March 7, 2018.

Dr. Bernstein testified that Child attended the evaluation with a pre-planned agenda having appeared to be influenced. He described her as purposeful in making her position known and that Child's point of view is an "exact match" to Mother's. He opines that Child feels pressured and thus places pressure on herself. Mother and Father's constant conflict also places stressors on Child.

He can make no definite conclusion as to whether or not Child was the victim of sexual abuse. However, he testified that Child's acting out is consistent with sexual abuse. He is concerned if the facts show Child is masturbating.

Dr. Bernstein did not change his opinion or recommendation based upon Dr. Priess' information. Dr. Bernstein does observe that Child "is subjected to felt conflict, pressure, and even confusion about the basis of her parent's discord." Child is unable "to fully appreciate the significance of her situation." He concludes that Mother pressures Child. He notes that Father and <span>A.A.</span> ████████ "provide support, supervision and exposure to opportunities" which provides Child a "stable, secure and safe home environment." While Mother is loving, he opines that she is "singularly focused" and this impacts her parenting decisions which in turn pressures and burdens Child.

30

As to Mother and Father, he opines that neither have shown significant improvement in co-parenting. Their communication level is adequate, at best.

Of note in Dr. Bernstein's report is the following:

> *Mother*           *Father*        *A.A.*
> ██████ view the Court, ████, ████████, and Ms. Lozzi as biased, unjust, and unfair in their respective views. She does not appear to appreciate the impact of her decisions. For example, she discounts [Child's] initial allegation of misconduct against [H.G.] and instead, adopts [Child's] weak attempt to explain the allegations as a joking attempt to fool the therapist and OCYF. She disregards ██*Father*██ and other's reports about [Child's] sexual acting out behaviors as well. Consequently, [Child] is encouraged to independently resolve feelings related to the alleged mistreatment. ████ *Mother* encourages [Child] to desire reunification with [H.G.], the very person who may have offended her.

The facts presented at this trial support Dr. Bernstein's perspective. In fact, based upon the facts presented, the Court concurs with Dr. Bernstein's observation that it is curious how Child feels such loss of separation from siblings with whom she has been separated for four years with very little memory of time spent together. The evidence and testimony presented at trial supports that it is Mother's pressure to reunify her family that keeps Child's grief and loss alive. Dr. Bernstein testified that the majority of the felt loss is by Mother not the children.

In rendering his opinion, Dr. Bernstein noted:

> [a]s much as [Mother] should receive additional custody, how she will adjust and accommodate is uncertain. She shares custody with ██*K.G.*██ and needs to restrict her other children from access to [Child], until at which point, the Court orders otherwise.

*Id.* To that end, Dr. Bernstein testified that his recommendation to grant Mother additional custody time would be impacted if it were true that Mother permitted her other children to be around Child in direct violation of this Court's Order.

D 591

To reiterate given the protracted discussion of the facts, child custody actions are governed by the Child Custody Act, 23 Pa.C.S.A. §§ 5321–5340. The primary concern in any custody case is the best interests of the child. *E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

> (a) **Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In deciding the best interests for the children, the Court applies the factors as follows:

**(1) Which party is more likely to encourage and permit frequent and continuing contact between the children and another party?**

Neither party encourages a relationship between Child and the other parent. Father is not trustful of Mother. Mother blames Father for her loss of full-time parenting. However, Mother demonstrates secretive behavior which fuels Father's lack of trust. Father does follow the custody orders, and there is no evidence that Father prohibits Mother's relationship with Child.

33

However, Father needs to appreciate that Child desires a relationship with her Mother and that Child is experiencing loss due to the custodial arrangement.

> **(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the children or an abused party and which party can better provide adequate physical safeguards and supervision of the children.**

This issue underscores the conflict between Mother and Father. The record clearly established at the 2014 trial sexual abuse between Child's older siblings, Edward and H. G. The record clearly established at the 2014 trial sexual contact by H.G. on Child. There has now been over four years since the last allegation. However, Mother, Child and H.G. continue to minimize the events and while Mother and H.G. claim to have resolved the issues in therapy, the testimony does not support that. Additionally, the perverse violent pictures drawn by A.G. are at the very least concerning. The Court draws a negative inference that Mother was not concerned about A.G.'s drawings and not seeking any counseling for the motivation behind the drawings. The Court would have concerns about Father's writings, however, they are twelve years old and there is not current evidence to support Mother's argument that Father is sexually perverse. In the custody order dated June 29, 2015, the Court relied upon Child's therapist to recommend when Child could and should have contact with H.G. There is no evidence of record from which this Court could conclude whether reunification with Child's siblings is in her best interest. The Court must rely on Child's therapist to drive that issue. The question before the Court is limited to the parenting time which is in Child's best interest. Of important note is that this Court did not restrict contact between Child and her brothers, Henry and A.G. Rather, the Court left that to the agreement of the parties in conjunction with Child's therapist. However, after viewing A.G.'s drawings and the totality of the circumstances of this case, including but not limited to,

34

the sexual abuse history, the Court finds that Child does not have the insight or protective capacities to address future possibilities of sexual victimization and should, therefore, not have unsupervised contact with A. G. to provide safety for Child. Mother continues to be secretive and minimizes the need for safety of Child. Father can better provide adequate physical safeguards for Child.

**(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).**

This factor weighs in favor of Father. All current investigations and reports by Children and Youth Services are unfounded.

**(3) The parental duties performed by each party on behalf of the children.**

Each parent performs their parental duties, in that Mother and Father both adhere to the needs of the child during their respective parenting time. Accordingly, this factor does not weigh in favor of either party.

**(4) The need for stability and continuity in the children's education, family life and community life.**

Father provides the more stable life for Child. Mother demonstrates hostility toward Child's teachers and school personnel. Mother's lack of insight and poor parenting decisions impact Child's stability.

**(5) The availability of extended family.**

Both parents have available extended family. Even though Child could attend Mother's extended family functions, there was no evidence that she does so on a regular basis. There was no testimony that Child interacts with Mother's extended family. Father's parents are active in Child's life.

As such, this factor weighs in favor of Father.

35

R 585

**(6) The children's sibling relationships.**

See Factor 2 for additional analysis. Child has minimal to no relationship with any of her siblings. She has not spent substantial time with them for over four years. There is a large age difference between Child and her siblings. Child's therapist has made no recommendation for reunifying Child and siblings.

**(7) The well-reasoned preference of the children, based on the children's maturity and judgment.**

The Court considered Child's preference and accorded it little weight in light of Child's age and maturity.

**(8) The attempts of a parent to turn the children against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the children from harm.**

Here, there is no evidence to suggest that either parent attempts to turn the child against the other parent.

**(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the children adequate for the children's emotional needs.**

Father is better equipped to provide a stable environment free from potential safety threats. Mother and Father are both capable to maintain a nurturing relationship with Child. However, Mother continues to lack insight into the emotional harm done by H.G. toward Child, and its unfortunate long-lasting consequences. Mother pressures Child and contributes to Child's feelings of guilt.

**(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the children.**

36

D ⊂O⊂

This factor is not an issue, in that both parents are willing and able to attend to the daily physical, emotional, developmental, educational, and special needs of the child. Accordingly, this factor does not weigh in favor of either party.

**(11) The proximity of the residences of the parties.**

Mother and Father live approximately forty-five minutes away from each other.

**(12) Each party's availability to care for the children or ability to make appropriate child-care arrangements.**

This factor is not an issue, in that both parties enjoy the added support from extended family to provide childcare or use appropriate child care providers.

**(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

Here, there is a high level of conflict between Mother and Father. They are unable to communicate in a reasonable or effective manner when it comes to making decisions on behalf of Child. However, some of Father's unwillingness can be attributed to the abuse issues and continued secrecy displayed by Mother. Accordingly, this factor does not weigh in favor of either party.

**(14) The history of drug or alcohol abuse of a party or member of a party's household.**

The parties agree, and the Court finds, that neither party exhibits any history of drug or alcohol abuse.

**(15) The mental and physical condition of a party or member of a party's household.**

37

R 587

This factor is not an issue, in that the parties do not exhibit any mental or physical limitations to care or provide for their child, and thus, this factor does not weigh in favor of either party.

**(16) Any other relevant factor.**

This Court was hopeful that since the first trial that Mother would come to fully appreciate Child's needs, and specifically appreciate the effects of Child's past sexual abuse. Rather, the Court finds that Mother is hyper-focused on the goal of reunification of her children and family as a whole rather than the specific issues which caused the current custody plan to be mandated.

The Court relied heavily on Dr. Bernstein's testimony and report. He wrote:

> *Mother*
> ~~[redacted]~~ presents as a loving mother who works hard to consider her daughter's best interests. At times, however she tends to be singularly focused upon the limits of her custody and separation of [Child] from her siblings. Her distraction appears to interfere with her parenting decisions and in turn, pressures [Child] to feel burdened with responsibility and unnecessary distress. [Child] separated from her siblings at age four years old. How much she appreciated and values the absence of a relationship with [H.G. and A.G.], who are approximately seven years her senior, is curious and in question. I suspect that [Child] is reminded of the separations by ~~[redacted]~~ *Mother* and therefore, pressured to seek reunification.
>
> *Mother*
> As loving as ~~[redacted]~~ presents and even considering the strong bond shared with [Child], I am struggling to overlook her identification as a victim and in particular, view of the Court, ~~[redacted]~~ *Father*, ~~[redacted]~~ *A.G.* and Ms. Lozzi as collectively biased against her. By adopting such a view, she avoids accepting responsibility and therefore, continues in her quest to reunify the family without consideration for the potential impact toward [Child]. Are sibling relationships important? Of course, but not at the expense of a child's need for safety and welfare.

38

Mother's actions and attitudes are negatively impacting Child. Dr. Bernstein opined that Mother "further pressures her."

Of major concern to this Court in the first trial was Mother's protective capacity to keep Child safe. Secrets and outright denial of abuse by Mother and extended family were red flags for whether Mother had a good faith desire to take the action necessary to protect Child. Unfortunately, no evidence was presented at this trial to show positive change. In fact, Mother's extended family testified that they really know little about the underlying issues. The Court does not expect Mother to share every detail of the prior documented abuses with her family, but there should be a basic understanding of what is needed for appropriate supervision. Even more concerning is that Child's siblings aren't acutely aware of the family dynamic of sexual abuse. Dr. Bernstein wrote "H. G. and A.G. expressed uncertainty and confusion as to why Child is separated from her siblings". One of the primary reasons for this Court's order preventing contact between Child and some of her siblings was so that H.G. and Child could productively receive therapy as to the prior sexual abuse in addition to Child's physical safety. The June 29, 2015, Custody Order, paragraph 2, prohibits contact between Child and H. G. until such time as Child's therapist recommends otherwise. [emphasis added] Paragraph 4 of that order states, "Once Child's therapist recommends that it would be in Child's best interest to have contact with H.G. and /or Edward, either party may petition the Court to begin the appropriate, therapeutic, supervised or monitored visits." Of note, there was never a no contact provision in the June 25, 2015, Custody Order between Child and Henry or A.G.

The approximate three years between the two custody trials has not proven to be a time of growth for either party or Child. The Court's hope in 2015, was that through individual therapy and co-parenting counseling, the Child and her siblings would heal from the tragic sexual

39

encounters between them, that Mother would gain insight and learn and demonstrate protective capacities for Child, and that both parents would learn to co-parent effectively. Unfortunately, none of those goals were met. This case is not about finding fault as to any of the prior sexual encounters between Edward and H.G. or H.G. and Child, but rather it is about Mother's unwillingness or inability to gain a protective capacity of one child over the others. Mother continues to focus on a make-believe world rather than deal with the realities her children experienced. It is this Court's continued hope that through counseling she will gain the necessary insight to provide a safe environment for Child, and the transparency needed to gain a modicum of trust by Father. Finally, the Court encourages Father to work in counseling on recognizing Child's need to have a relationship with her Mother and ways he can help Child with her own grief and loss.

The competent evidence of record supports this Court's Order at issue. Mother's final issue is simply an attack of the credibility and weight of the evidence afforded by the Trial Court to which deference is given. Because the Trial Court's conclusions are reasonable as shown by the evidence of record, this Court did not commit an abuse of discretion and/or an error of law by reducing and limiting Mother's partial physical custody.

**BY THE COURT**

**Kelley T. D. Streib, Judge**

jla

40